725 P.2d 162

The **BUNKER HILL COMPANY, a Delaware corporation; and Bunker Limited Partnership, an Idaho limited partnership, Plaintiffs-Respondents,**

v.

**STATE of Idaho, ex rel. STATE TAX COMMISSION, Defendant-Appellant.**

**No. 15789.**

Supreme Court of Idaho.

Aug. 28, 1986.

Rehearing Denied Aug. 28, 1986.

Jim Jones, Atty. Gen. and Theodore V. Spangler, Jr., Deputy Atty. Gen., Boise, for defendant-appellant.

William F. Boyd, Kellogg, James P. Keane, Coeur d'Alene, and Charles L.A. Cox, Kellogg, for plaintiffs-respondents.

1986 opinion no. 11, issued January 24, 1986, is hereby withdrawn and this opinion is substituted therefor.

## ON DENIAL OF PETITION FOR REHEARING

HUNTLEY, Justice.

This appeal raises the issue as to whether certain purchases of tangible personal property by Bunker Hill are subject to the payment of a 3% tax under the Idaho Sales Tax Act, Title 63, Chapter 36 of the Idaho Code. Specifically at issue are four categories of purchases: (1) materials utilized in the construction of two steel-reinforced concrete smoke stacks, 610 and 715 feet in height; (2) ties, spikes, plates and rails used to construct an intraplant railway (surface rail); (3) oxygen and acetylene welding gases consumed in the repair of production equipment; and (4) safety clothing and equipment issued to employees.

## I. BACKGROUND

An audit of the Bunker Hill Company conducted by the State Tax Commission audit staff resulted in the issuance of a notice of deficiency determination for the period of January 1, 1975 through December 31, 1977. At the conclusion of the administrative proceedings, the Tax Commission ruled that there was due $149,936 in unpaid taxes, interest of $70,844, and penalty of $7,497, for a total of $228,277. Bunker Hill filed a timely complaint in district court which resulted in a decision that none of the taxes were due, the court holding that the purchases were exempt under I.C. § 63–3622(d). This appeal followed. We discuss the appropriate treatment of each of the four categories of purchases in turn.

## II. THE "TALL STACKS"

During the audit period, Bunker Hill constructed two tall stacks, one for its zinc plant and the other for its lead smelter, which were affixed to the real estate on large foundations. The stacks were over 610 feet and 715 feet tall, respectively. Construction was done with a continuous pour of concrete in a "slip form" that rose vertically as the concrete in the form set sufficiently to sustain weight, the materials utilized being primarily reinforcing steel bars and the ingredients of the concrete. Bunker Hill provided its suppliers with exemption certificates and, thus, the sales tax was not collected by the vendors of the tangible personal property.

I.C. § 63–3619 (1975–77) provides in pertinent part:

An excise tax is hereby imposed upon each sale at retail at the rate of three per centum (3%) of the sales price of all property subject to taxation under this act. . . .

The terms "retail sale" and "sale at retail" are defined in I.C. § 63–3609 (1975–77) which reads in pertinent part:

**63–3609. Retail sale—Sale at retail.**—The terms "retail sale" or "sale at retail" means a sale of tangible personal property for any purpose other than resale of that property in the regular course of business or lease or rental of that property in the regular course of business where such rental or lease is taxable under section 63–3612(h) of this act.

(a) All persons engaged in constructing, altering, repairing or improving real estate, which includes construction of prefabricated buildings as defined in section 63–3606A, are consumers of the material used by them; all sales to or use by such persons of tangible personal property are taxable whether or not such persons intend resale of the improved property.

Bunker Hill's purchases of the materials for the tall stacks clearly come within the provisions of I.C. § 63–3609(a), since the stacks were real estate and that Bunker

Hill was, by definition, the consumer of the material used to construct the stacks. Bunker Hill was, then, required to pay the sales tax at the time it purchased the materials.

Bunker Hill urged before the trial court, and urges before this Court, that this transaction is subject to the so-called "production exemption" contained in I.C. § 63-3622(d) (1975-77) [1], arguing that the stacks have become production equipment which is used to produce the products at the mine and smelter. Such is a novel, and rather tortured, interpretation of the act. The Sales Tax Act imposes a tax only on tangible personal property, and the exemptions are exemptions of tangible personal property which would otherwise be subject to the tax. The stacks as such are real property and therefore are not in the class of "tangible personal property" exempted in I.C. § 63-3622(d). In other words, the literal language of the production exemption is that it applies to tangible personal property used or consumed in the production process. Thus, we reject the novel argument that the "use" of the stacks is the taxable event, rather than the purchase of the materials which went into the construction of the stacks, since the purchases clearly are the taxable event involved under the plain wording of I.C. § 63-3609.

■ On petition for rehearing, Bunker Hill asserts that we have misconstrued the statute by " ... choos[ing] a different date to determine the exemption than the date of the taxable event." That is, that the date of the purchase of the materials (cement, rebar, etc.) from which the stacks were built, is the taxable event and that this court used the time of status as completed stacks to determine the applicability of the exemption. Such a characterization of the analysis is incorrect. We apply the date of purchase of the materials for both analyses. On the date of purchase, the materials were not being used to produce anything under the exemption statute— they were purchased for incorporation into real estate.

■ The rationale for imposing the sales tax on tangible personal property used to construct or improve real estate is well stated in the report of the House Revenue and Taxation Committee on House Bill 222, which implemented the tax. In referring to I.C. § 63-3609, the report stated:

> Section 9(a) is intended to ensure that there will be a tax imposed on the sale of building materials and other items that will be used to erect buildings or otherwise improve real property. The process of construction is regarded as a service, and sale of materials to the contractor is taxed without regard to resale intentions. This insures that a tax will be collected. Since the sale of the building or other real property will not be taxed, sale of

---

**1.** **63-3622. Exemptions.**—There are exempted from the taxes imposed by this act the following:

    ....

(d) Receipts from the sale, storage, use or other consumption in this state of tangible personal property which will enter into and become an ingredient or component part of tangible personal property manufactured, processed, mined, produced or fabricated for ultimate sale at retail within or without this state, and tangible personal property primarily and directly used or consumed in or during such manufacturing, processing, mining, farming, or fabricating operations by a business or segment of a business which is primarily devoted to such operation or operations, provided that the use or consumption of such tangible personal property is necessary or essential to the performance of such operation. Chemicals, catalysts, and other materials which are used for the purpose of producing or inducing a chemical or physical change or for removing impurities or otherwise placing a product in a more marketable condition are included within this exemption, as are other articles of tangible personal property used in the actual manufacturing, processing, mining, farming or fabricating operations. This exemption does not include machinery, equipment, materials and supplies used in a manner that is incidental to the manufacturing, processing, mining, farming or fabricating operation such as maintenance and janitorial equipment and supplies, and hand tools with a unit purchase price not in excess of one hundred dollars ($100); nor does it include tangible personal property used in any activities other than the actual manufacturing, processing, mining, farming or fabricating operation such as office equipment and supplies, equipment and supplies used in selling or distributing activities, in research, or in transportation activities; ....

the materials which are used to erect or improve it must be taxed if a tax is to be imposed on consumption of this property.

Accordingly, we must reverse that portion of the ruling of the trial court which exempts from taxation the purchase of the materials and supplies later incorporated into the tall stacks.

Bunker Hill, in its petition for rehearing, correctly notes that our remand should permit the trial court to rule on the applicability of the pollution control exemption of I.C. § 63–3622(e)[2] to a portion of the materials incorporated into the tall stacks. The trial court memorandum opinion noted:

> The parties agreed that the cost of materials incorporated into the stacks is the sum of $4,390,392. A portion of these materials were [sic] purchased after July 1, 1977, the effective date of a statutory exemption commonly called the "pollution exemption." The cost of the materials after July 1, 1977, was $1,231,352.

Bunker Hill's request is well taken. Accordingly, on remand, the trial court will determine what portion of the $1,231,352 expenditure, if any, qualifies for such exemption.

### III. SURFACE RAILROAD

■ Bunker Hill owns and operates a surface railroad system at its facility consisting of 8.4 miles of track. One mile of that track is used for shipping the finished product which is ready for marketing either directly to market or to storage areas awaiting marketing. It is the tax on the materials utilized to construct the remaining 7.4 miles that is in dispute, those materials having a value of $2,095. Since Bunker Hill purchased the track, spikes, and ties for "constructing, altering, repairing, or improving real estate," the purchase of those materials was subject to tax under

I.C. § 63–3609, keeping with the analysis utilized with respect to the tall stacks.

### IV. OXYGEN AND ACETYLENE

The oxygen and acetylene purchases at issue involve purchases totaling $38,059, the gases having been utilized in the welding and repair of production process equipment. Again, Bunker Hill seeks to exempt these purchases under the production exemption of I.C. § 63–3622(d).

The Tax Commission asserted a tax on the oxygen and acetylene used to perform repair work on production equipment since the welding work does not directly contribute to the producing of tangible personal property for resale. The production exemption statute specifically excludes from the production exemption equipment which is merely used to "maintain" production equipment. It reads:

> ... This exemption does not include ... materials and supplies used in a manner that is incidental to the manufacturing ... operations such as maintenance and janitorial equipment and supplies....

The district court believed that the legislature intended to make a distinction between "maintenance" and "repair," concluding in its memorandum opinion:

> It does appear that the legislature intended to draw a line of distinction between maintenance and repair. In any given case or process this is going to be a very difficult line of demarcation. Some examples would seem to be easily distinguished such as oil or grease regularly put upon machinery bearings to prevent their deterioration which would clearly be maintenance. On the other hand, if the bearing breaks and needs to be replaced or welded to restore its integrity it would seem to be repair.
>
> It is the Court's conclusion that applying the foregoing criteria to the facts of this

2. **63–3622. Exemptions.**—There are exempted from the taxes imposed by this act the following:

   •    •    •    •    •

   (e) The sale, use or purchase of tangible personal property, which property is pollution control equipment required in order to meet air and water quality standards of a state or federal agency having authority to regulate and set air and water quality emission standards. This exemption does not include motor vehicles required to be licensed by the laws of this state, without regard to the use to which such motor vehicles are put.

case that the oxygen and acetylene were in fact used as repair for broken parts. Therefore, the production exemption should be applicable.

No authority for this conclusion and no language relating to any distinction between "maintenance" and "repair" appears in the statute. To create an arbitrary distinction between "maintenance" and "repair" in order to exempt materials used in one activity, while taxing materials used in another, is not justified under the language of the statute.

No case brought to our attention has made a distinction like the one made by the district court below. Instead, those courts which have considered the application of the sales tax production exemption to repair equipment have concluded that such equipment is subject to taxation. *See Dain Mfg. Co. v. Iowa State Tax Commission,* 237 Iowa 531, 22 N.W.2d 786 (1946), involving a drill grinding machine which was used to service the machinery directly used in production. *Webster Brick Co. v. Department of Taxation,* 219 Va. 81, 245 S.E.2d 252 (1978), held taxable the machinery and tools, including a crane and hoist unit, used to maintain and repair production machinery. In *General Motors Corp., Fisher Body Division v. Bowers,* 169 Ohio St. 361, 159 N.E.2d 739 (1959), the court held taxable the machine tools and equipment bought and used for the building of fixtures and other parts of metal working presses used to stamp automobile panels.

The Idaho legislature's requirement that materials be *primarily* and *directly* used or consumed in a production activity, and that the exemption not include materials and supplies which are used incidentally to the production activity (even though it might be necessary and essential to the conduct of that activity), requires that there be some limitation to the scope of the exemption. It cannot be facilely expanded to include everything that is necessary and essential to the operation. The decisions cited above have restricted the exemption, under similar statutory language, in such a manner as to exclude from exemption those

activities which constitute repairs to production equipment.

In *Richardson v. State Tax Commission,* 100 Idaho 705, 604 P.2d 719 (1979), this court, having under consideration the application of the production exemption to a fire safety sprinkler system, noted:

> It is our conclusion that although the sprinkler system may be necessary and essential to the continued operation of the taxpayer's business, it is not integrated with or directly related to the sawmill operation. (100 Idaho at 709, 604 P.2d at 723.)

Here, the oxygen and acetylene are not "primarily and directly used or consumed in or during such ... processing operations ...," but rather, their use is incidental to and not directly related to the production process.

■ Accordingly, we hold that the purchases of oxygen and acetylene constitute taxable transactions which are not subject to the production exemption.

### V. SAFETY EQUIPMENT

Bunker Hill, by amendment of its complaint in August of 1983, asserted for the first time a claim to a refund for sales taxes paid on the purchase of safety equipment during the calendar years 1975, 1976, and 1977. The equipment included such items as protective shoes and boots, hardhats, goggles, earmuffs, respirators, protective clothing, and mine safety equipment such as safety belts and safety ropes.

■ The trial court awarded Bunker Hill a refund of the taxes paid on those items, from which order and judgment the Tax Commission appeals. The Tax Commission asserts that the trial court erred in awarding the refund for two reasons: (1) No timely claim for refund was ever filed; and (2) the production exemption is not applicable or available to such purchases, in any event. We need not reach the timely claim issue because the second issue is dispositive. Our case of *Richardson v. State Tax*

**462**

*Commission,* 100 Idaho 705, 604 P.2d 719 (1979) is determinative of this issue. There we had under consideration the application of the sales tax production exemption to a fire safety sprinkler system, this Court stating:

> We are, however, unable to agree with the trial court's conclusion that the sprinkler system installed by the taxpayer in his lumber mill was equipment directly used in the milling operation. The sprinkler system itself is a type of standby safety equipment which we believe is properly characterized as being incidental to the manufacturing process and therefore not within the sales tax exemption provided in I.C. § 63–3622(d). That section provides in part that:
>
> > "This exemption does not include machinery, equipment, materials and supplies used in a manner that is incidental to the manufacturing, processing, mining, farming or fabricating operations such as maintenance and janitorial equipment and supplies, . . . ."
>
> It is our conclusion that although the sprinkler system may be necessary and essential to the continued operation of the taxpayer's business, it is not integrated with or directly related to the sawmill operation. *See, e.g., Consolidation Coal Co., Hannah Coal Co. Division v. Kosydar,* 42 Ohio St.2d 189, 326 N.E.2d 864 (1975) (standby mine safety equipment held not directly used or consumed in the production of property for sale); *Indiana Dept. of State Revenue, Sales Tax Division v. R.C.A. Corp.,* 160 Ind.App. 55, 310 N.E.2d 96 (1974) (air conditioning equipment used to rigidly control the quality of the air in a color television picture tube plant held not to be directly used in the production of the tubes, although the equipment was an essential part of the process). *Richardson,* 100 Idaho at 709, 604 P.2d at 723.

Again, it is clear that the safety clothing and equipment is not "primarily and directly used or consumed" in the production process. In *Indiana Dept. of State Rev. v. Harrison Steel,* 402 N.E.2d 1276 (1980), the court stated:

> We, thus, determine that the use of safety equipment in the production process is not a "direct use" as it does not have a positive effect and active causal relationship to the production of a product. *Safety equipment is for the protection of workers not the creation of a product.* We, therefore, reverse and remand on this issue. (Emphasis supplied). (402 N.E.2d at 1278.)

Accordingly, we hold that the purchases of the safety clothing and equipment are not exempt from the sales tax.

## VI. CONCLUSION

For the reasons hereinabove stated, the judgment of the trial court overruling the deficiency determination asserted by the Tax Commission is reversed and the case is remanded to the trial court for entry of judgment consistent herewith. The trial court, in light of its decision in favor of the taxpayer, did not resolve the issues raised by Bunker Hill as to the appropriateness of the penalty and interest determinations by the Tax Commission, and thus those issues and the effect of the pollution control equipment exemption should be determined on remand. We have considered the additional matters raised by Bunker Hill's petition for rehearing and find them either to be without merit or disposed of in the above and foregoing analysis.

Costs to the appellant. No attorney fees awarded on appeal.

DONALDSON, C.J., and BISTLINE, J., concur.

BAKES, Justice, dissenting:

The Court does a very unusual thing when, after refusing to consider the petition for rehearing and allowing the parties an opportunity to argue their respective positions, the Court addresses arguments

raised in Bunker Hill's petition for rehearing. The Court should either grant the petition for rehearing and allow the parties an opportunity to argue their respective positions, or strike all references to arguments made in that petition from this opinion.

That problem aside, my primary objection to the opinion of the Court is that it completely overlooks this Court's appellate function. This case was tried to the district court which, in an extensive memorandum opinion, made findings of fact, conclusions of law and entered a judgment. This is an appeal from that judgment in which the appellant tax commission asserts that the district court erred in its findings and conclusions. However, only in one instance does the Court even discuss the district court's decision and the findings which it made. The majority opinion is written as though the majority of this Court was acting as a trial court finder of fact in the first instance, which essentially is what it is doing. The only time the majority addresses the district court's opinion, it criticizes the distinction which the district court made between "maintenance" and "repair," stating that the distinction is "arbitrary" and "not justified under the language of the statute." However, what the majority overlooks is that the distinction between "maintenance" and "repair" was not introduced into this case by either the taxpayer or the district court. That was an interpretation of the statute by the tax commission and was testified to by tax commission witness, Mr. Loy.

The distinction between "maintenance" and "repair" is a sound one and is based upon the statute. The production exemption set out in I.C. § 63–3622(d) provides that tangible personal property, such as equipment, which is "primarily and directly used or consumed in or during such manufacturing, processing [or] mining" is exempt from the tax. However, "machines, equipment, materials and supplies used in a manner that is incidental to the manufac-

turing, processing [or] mining ... operation, such as *maintenance and janitorial equipment* and supplies" are not exempt. (Emphasis added.) I.C. § 63–3622(d). If the production equipment is consumed or breaks down and has to be replaced, its replacement is exempt under the production exemption. If the equipment can be repaired by replacing only portions of it, rather than the entire equipment, then the replacement portions are exempt. That is repair. However, I.C. § 63–3622(d) specifically provides that "maintenance ... equipment" is not exempt. Thus, the tax commission's distinction, which the district court followed in this case, is clearly provided for in the statute. The only question in this case was an interpretation of the peculiar facts in this case as it relates to the distinction which both parties acknowledged and testified to before the district court. For the majority to state that there is no basis for a distinction between "maintenance" and "repair" under the statute is not only contrary to the interpretation which both parties put on the statute before the district court, and which became the theory upon which the case was tried, but is also contrary to the statute and the regulations themselves. In this regard, the majority opinion will no doubt cause a great deal of confusion and difficulty in the years to come as the tax commission tries to readjust to this new interpretation of these highly technical statutes.

Except for the foregoing reference to the district court's distinction between "repair" and "maintenance," the majority of the Court does not address the findings of fact and conclusions of law which the district court entered in this case. Since I believe that those findings of fact are supported by the record, and since the district court did not err in its conclusions of law, the district court's decision should be affirmed. That opinion is set out as an appendix to this dissenting opinion.

SHEPARD, J., concurs.

APPENDIX

THE BUNKER HILL COMPANY, a corporation, Plaintiff,

vs.

STATE TAX COMMISSION OF THE STATE OF IDAHO, Defendant,

and

THE BUNKER HILL COMPANY, a Delaware corporation; and BUNKER LIMITED PARTNERSHIP, an Idaho limited partnership, Plaintiffs,

vs.

STATE OF IDAHO, *ex rel.* STATE TAX COMMISSION, Defendant.

Case nos. 21146, 24226.

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF SHOSHONE

August 29, 1984.

MEMORANDUM OPINION

This case arose following an audit for sales and use tax purposes conducted by the defendant for the period January 1, 1975, through December 31, 1977. For that period the tax payer had timely filed sales and use tax returns and paid the amount of tax it acknowledged as being due.

The defendant had filed a deficiency notice for tax, penalty and interest on February 15, 1978, for the month of January, 1975, asserting an additional tax due of $5,000 plus penalty in the amount of $250 plus interest. March 22, 1978, the defendant filed a second deficiency notice for the month of February, 1975, claiming an additional tax due of $5,000 plus a penalty of $250 and plus interest. The third deficiency notice was filed by the defendant April 17, 1978, covering the entire period of January 1, 1975, through December 31, 1977. In this third notice the defendant asserted there was additional tax due in the sum of $750,789 plus penalty in the amount of $37,739 and interest of $81,140 for a total of $873,668. To all of these deficiency notices the plaintiff filed timely protest and petition for redetermination. On November 1, 1982, the defendant rendered its decision. Therein the defendant ruled that there was a sum of $149,936 due as tax plus interest of $70,844 and penalty in the amount of $7,497, for a total amount due of $228,277. The appeal to this Court followed.

The basic issues may be summarized as follows:

(1) Whether material used by the plaintiff in constructing two tall stacks was subject to use tax.

(2) Whether oxygen and acetylene used in repair of production equipment is subject to use tax.

(3) Whether certain rail tracks, spikes and ties used by plaintiff in its intraplant surface railroad system is subject to use tax.

(4) Whether certain safety clothing and equipment used by plaintiff's employees working in the production process is subject to use tax.

(5) If there be any tax due is it appropriate to assess a penalty or charge interest in addition to the tax.

I. TALL STACKS

The parties agreed that the cost of materials incorporated into the stacks is the sum of $4,390,392. A portion of these materials were purchased after July 1, 1977, the effective date of a statutory exemption commonly called the "pollution exemption." The cost of the materials after July 1, 1977, was $1,231,352.

The two stacks are constructed of concrete and reinforcing steel and extend some 650 to 700 feet into the air. The necessary materials were purchased by plaintiff, brought to the site and the stacks were constructed on land owned by the plaintiff.

The Court finds from the evidence that the smelter operations from the plaintiff could not be conducted without the stacks. The two stacks in question replace prior stacks but are much larger. Because of the increased air draft created by the larg-

er stacks the plaintiff was able to recover a larger quantity of metal-bearing dust than it had previously. The stacks enabled plaintiff to increase its production of sulphuric acid by some 25 to 30 thousand tons per year. The tall stacks enable the plaintiff to increase its capture of sulphur from 78% of the content of the ores to 88%. The stacks also serve to disperse gas and dust material from the work areas. But they are not simply a dispersion technique. The stacks resulted in the increased production of metal and sulphuric acid as well as reducing the amount of dust and sulphur dioxide placed into the atmosphere. The stacks served a two-fold purpose of increasing production for plaintiff and reducing the amount of pollutants emitted into the atmosphere. But if the stacks did not exist it would be entirely impossible to operate the metallurgical facilities, i.e. the smelter. Neither the blast furnace for lead nor the zinc smelter could be operated without a tall stack. The stacks were absolutely necessary in the operation both for production and pollution control. Without the draft created by the stacks, the emissions of air borne particulate, carbon monoxide and sulphur dioxide in the work place would cause asphyxiation of the employees and expose the employees to heavy metal poisoning.

One of the stacks extends 610 feet in the air and the other 715 feet. They are made of concrete and steel. They are in effect concrete tubes. A similar concrete tube installed as a mine shaft by Hecla Mining Company has been exempted by the defendant from sales and use tax. Concrete and steel used by the plaintiff in underground operations in mining and timber used for ground support in underground openings are all treated by the defendant as tax exempt.

I.C. 63–3621 provides:
An excise tax is hereby imposed upon the storage, use, or other consumption in this state of tangible personal property acquired on or after July 1, 1965, ...

I.C. 63–3615(b) provides:

The term "use" includes the exercise of any right or power over tangible personal property incident to the ownership or the leasing of that property....

I.C. 63–3609(a) provides:
All persons engaged in constructing, altering, repairing or improving real estate, ... are consumers of the material used by them; all sales to or use by such persons of tangible personal property are taxable whether or not such persons intend resale of the improved property.

The foregoing sections make it clear that the acquisition of tangible personal property even if it is to be thereafter incorporated into a structure that would be considered a part of the real estate is a taxable event. Thus, the acquisition of the steel and concrete and other materials by plaintiff for construction of the stacks would have been a taxable event unless there is some statutory exemption. Plaintiff contends that it is entitled to the production exemption found in I.C. 63–3622(d) and the pollution control exemption found in I.C. 63–3622(e).

In considering such exemptions it must be kept in mind that statutory tax exemptions exist only by legislative grace and should be strictly construed against the taxpayer. *See Richardson v. State Tax Commission*, 100 Idaho 705, 604 P.2d 719.

I.C.63–3622(d) provides, in pertinent part, as follows:
There are exempted from the taxes imposed by this act the following: ... tangible personal property primarily and directly used or consumed in or during such manufacturing, processing, mining, farming, or fabricating operations by a business or segment of a business which is primarily devoted to such operation or operations, provided that the use or consumption or such tangible personal property is necessary or essential to the performance of such operation ... Materials which are used for the purpose of producing or inducing a chemical or physical change or for removing impurities or otherwise placing a product in a more marketable condition are included within this exemption, ... This exemp-

tion does not include machinery, equipment, materials and supplies used in a manner that is incidental to the manufacturing, processing, mining, farming or fabricating operation such as maintenance and janitorial equipment and supplies and hand tools with a unit purchase price not in excess of one hundred dollars ($100); nor does it include ... equipment and supplies used in selling or distributing activities, in research, or in transportation activities; ....

Therefore, if tangible personal property is to qualify for the production exemption, it must be property which is both primarily and directly used in a processing operation and necessary and essential to it. There become five essential tests set forth by the statute and as reiterated by the Supreme Court in the *Richardson* case, *supra.* These are:

1. It must be tangible personal property.

2. It must be primarily and directly used or consumed in the processing operation.

3. It must be necessary or essential to the process.

4. It must be used in a business that is regularly engaged in such manufacturing or processing operation.

5. It must not be used in a manner merely incidental to the manufacturing or processing operation.

Applying the foregoing criteria to the facts as set forth hereinabove, it is the conclusion of this Court that plaintiff meets all five criteria as concerning the purchase of the materials used to construct the large stacks.

One of the reasons advanced by the defendant for disallowing the exemption was that the stacks constituted improvements to real property and the exemption applies only to tangible personal property. It is true that at the present time the stacks might well be considered part of the real property. However, at the time the materials were purchased they were tangible personal property. That was the taxable event and the purpose for which they were originally purchased and to which they were ultimately applied should be the determinative factor in deciding whether the production exemption applies. I.C. 63–3609(a), set forth above, expressly provides that materials that are to be used in constructing, repairing or improving real estate are taxable. However, that must be read in connection with I.C. 63–3622(d), the production exemption, and the two considered together *in pari materia.* Thus, even though the tangible personal property purchased may be eventually melded into the real estate, if the purpose and use of the property meets the requirements of the production exemption the original purchase transaction should be entitled to the benefit of that exemption.

The defendant contends that since the plaintiff could not distinguish as to whether the stacks were primarily for production or primarily for pollution control that the exemption cannot be allowed. It seems to be the defendant's position that there can be only one primary use. In the opinion of this Court that is overly narrow reading and application of the statute. If the legislature had so intended it could easily have said that any property to be exempt must be solely and only used for production and have no other use. It did not say so. It said simply that the property must be primarily and directly used in production. That does not mean that if there is any other use for the property in question it loses its qualification under the production exemption. In any event, even if the construction contended for by defendant be applied, the Court concludes that the stacks were primary to production. The uncontested testimony was that the entire plant simply could not operate without them. The lead smelter, the zinc smelter, the cinter machine and the roaster, would not operate without the draft created by the tall stacks. If these parts of the process do not operate there would be no dust to recover and there would be no pollution to control. Therefore, it seems the stacks are a fundamental and primary part of the entire production process. The Idaho Su-

preme Court has stated that the plain, obvious and rational meaning is always preferred to any hidden, narrow or irrational meaning. *State ex rel. Evans v. Click*, 102 Idaho 443, 631 P.2d 614; *Higginson v. Westergard*, 100 Idaho 687, 604 P.2d 51; *John Hancock Mutual Life Insurance Company v. Hayworth*, 68 Idaho 185, 191 P.2d 359. The defendant in its brief has made reference to the House Revenue and Taxation Committee Report on House Bill 222. The Court cannot consider the same. The same was never introduced into evidence by the defendant nor was there even any request made to the Court to take judicial notice thereof. Furthermore, where a statute is clear and unambiguous the expressed intent of the legislature as set forth therein must be given effect regardless of what the legislature may have thought it was saying.

The defendant has argued in its brief and in its original decision that while the stacks may have increased production "somewhat, production was not enhanced enough to justify their construction on that basis alone." Economic justification for a means or process of production is nowhere found in the statutory language and there is no authorization for the defendant to apply such test. To do so would put the defendant in the position of second guessing or "Monday morning quarter backing" every business decision made by any operating business. Such was not the legislative purpose or intent to establish such a regulatory agency.

As to the defendant's contentions that production must be the sole and only primary use and the same must be economically justified, there are no controlling Idaho cases. But *see Morley v. Brown and Root, Inc.*, 219 Ark. 82, 239 S.W.2d 1012, and *Heath v. Research—Cottrell, Inc.*, 258 Ark. 813, 529 S.W.2d 336.

Pollution control equipment itself may be indispensable to an operation when without it the law would not permit an operation to proceed. Common sense would seem to say that that which is essential to a processing or manufacturing operation and without which it cannot operate is something that is primarily and directly used in that process. *See Department of Revenue v. State Contracting and Stone*, 572 S.W.2d 421; *Duke Power Company v. Clayton*, 274 N.C. 505, 164 S.E.2d 289.

Finally it is appropriate to consider the defendant's treatment of like structures in similar circumstances. An administrative agency such as defendant has a duty of consistency toward similarly situated taxpayers and a duty to define and apply its policies in an even-handed way. *See Davis, Administrative Law Treatise* § 1707–4 and *Distrigas of Massachusetts Corporation v. F.P.C.*, 517 F.2d 761. A fundamental of justice is equality of treatment.

The Court concludes that the material purchased and used by plaintiff in the construction of the tall stacks was exempt from the use taxation.

## II. OXYGEN AND ACETYLENE

The oxygen and acetylene sales involved in this dispute total $38,059. This amount was determined by the use of a test month in each of the three years audited and no objection has been made by either party to this procedure.

The unrefuted testimony is that the oxygen and acetylene in dispute was used upon equipment that is clearly within the production process and was used for repair of that equipment.

The defendant contends that this constitutes maintenance within that portion of I.C. 63–3622(d) which reads that:

> This exemption does not include ... materials and supplies used in a manner that is incidental to the manufacturing ... such as maintenance and janitorial equipment and supplies....

The defendant according to the testimony of Mr. Loye makes a distinction between maintenance and repair. *The defendant recognizes that repair parts for production equipment which is exempt are also exempt.* It is noted that the statute uses the word "maintenance" and does not use the word "repair."

Webster's Ninth New Collegiate Dictionary defines "maintenance" as the act of maintaining and defines the root word "maintain" as meaning to keep in an existing state, as of repair, efficiency or validity and to preserve from failure or decline. The same source defines "repair" as meaning to restore by replacing a part or putting together what is torn or broken.

It does appear that the legislature intended to draw a line of distinction between maintenance and repair. In any given case or process this is going to be a very difficult line of demarcation. Some examples would seem to be easily distinguished such as oil or grease regularly put upon machinery bearings to prevent their deterioration which would clearly be maintenance. On the other hand, if the bearing breaks and needs to be replaced or welded to restore its integrity it would seem to be repair.

It is the Court's conclusion that applying the foregoing criteria to the facts of this case that the oxygen and acetylene were in fact used as repair for broken parts. Therefore, the production exemption should be applicable.

### III. SURFACE RAILROAD

The plaintiff owns and operates a surface railroad system at its facility consisting of 7.4 miles of track. One mile of that track is used for shipping the finished product which is ready for marketing either directly to market, or to storage areas awaiting marketing. It is the remaining 6.4 miles that are in dispute. The amount of materials that are in dispute had a value of $2,095.

The 6.4 miles are used for transporting concentrated ores from the concentrator to various production stages in the smelting and refining process and in transporting the metallurgical products from one station to another as the refining process goes along.

It is also noted that the defendant has granted the production exemption to underground rails used to transport ore within the mine.

The operation here in question is an integrated operation which extends from mining the ore, placing it on the underground rail whereby it is transported to a concentrator. At the concentrator the first process in refining the ore commences. After the concentrating process the ore is moved by rail to the next stage of the refining process and so on until the finished product is produced.

The amounts in dispute were expended for replacement track, spikes and ties for production track only. The 6.4 miles of railroad track in issue is used as a conveyor belt would be used to move material from one plant to another and within the plant itself. The Idaho Supreme Court in the *Richardson* case, *supra,* determined that such items are not merely auxiliary to the actual production or processing operation but are essential thereto and are used primarily and directly therein.

Just as in the case of the tall stacks, even if the railroad tracks after the component parts have been fashioned into being a railroad track are considered to be part of the real estate, the tax liabilities should be determined at the time the tangible personal property is purchased and in consideration of the purpose of that purchase.

Applying these criteria the Court concludes that the railroad track, ties and spikes were used in repair of production facilities and are entitled to the production exemption.

Again, it is noted that the defendant exempts the exact same property when used underground in the mining operation, has exempted fork lifts used in the smelter and has exempted material used to repair a water line that transports water to the manufacturing facility of the plaintiff. As hereinbefore noted, it is desirable that the defendant should be consistent in its interpretations and rulings.

### IV. SAFETY EQUIPMENT

As concerns this item the plaintiff is claiming a refund for the purchase of certain safety equipment and protective cloth-

ing it purchases and furnishes to its employees.

The threshold question is whether this can now be considered. The defendant has raised the issue that plaintiff's claim for refund as to the safety equipment is barred by the statute of limitation. There seems no dispute that no claim for refund was ever filed with the State Tax Commission nor was the issue raised at the hearing before the defendant. The refund was first claimed when plaintiff amended its complaint in August of 1983. I.C. 63–3626(b) provides:

No such credit or refund shall be allowed or made after three years from the time the payment was made, unless before the expiration of such period a claim therefor is filed by the taxpayer.

Defendant contends that plaintiff's time for claiming refund expired January 25, 1981.

In reply plaintiff points out that the amended complaint was filed pursuant to a stipulation of the parties and that the State has never filed an answer to the amended complaint. Thus, the defendant has never plead or raised the statute of limitations as an affirmative defense nor did the state raise such issue as an issue of law in the joint pretrial statement filed with the Court.

A party asserting a statute of limitations defense must plead the same. I.R.C.P. 8(c) and 12(b). *See Resource Engineering, Inc. v. Siler,* 94 Idaho 935, 500 P.2d 836; *DeSpain v. DeSpain,* 78 Idaho 185, 300 P.2d 500. The Court concludes that defendant has not timely or properly raised the defense of the statute of limitations and that the same is not now available to defendant.

The purchase price of the safety equipment involved amounts to $934,346.64. The items of protective equipment and clothing were used by employees directly engaged in the production process. If the employees did not use such equipment they would run the risk of serious injury or disease. Almost all of the items had been placed in use prior to the advent of any

requirements by O.S.H.A. or M.S.H.A. Following the advent of those agencies and their regulations all of the safety equipment and clothing were required. Those agencies had power and authority to suspend plaintiff's operations or assess civil penalties in the event plaintiff did not comply. The safety equipment in question was used directly and primarily in the manufacturing process. The equipment in question was not stand-by safety equipment as referred to in the *Richardson* case, *supra.*

In considering a statute similar to ours, the Ohio Supreme Court in the case of *Consolidation Coal Company v. Kosydar,* 42 Ohio St.2d 189, 326 N.E.2d 864, pointed out:

In attempting to interpret the ambiguous word, "directly," as used by the general assembly, this court has adopted a physical test: when does the manufacturing or processing activity begin and end, and is the property used or consumed during and in the manufacturing or processing period?

Applying that test the Ohio Supreme Court found safety equipment used by mining personnel to be exempt from sales and use tax. The same Court in *Carborundum Company v. Bowers,* 119 Ohio App. 195, 187 N.E.2d 600, found that fume, exhaust and dust-collecting equipment which served to protect production employees from physical injury and to protect production machinery and to prevent contamination of the product was used directly in the production process and was tax exempt. Likewise, in *Department of Revenue v. United States Steel Corporation,* 425 N.E.2d 659, the Indiana Supreme Court found that gloves and glasses used to protect production workers' eyes and hands were directly used in production. The Indiana Court stated:

The focus of analysis should be whether the safety equipment is an *integral* part of manufacturing and operates directly on the product during production. While this remains a narrow interpretation of the statute, it is consistent with the obvious legislative purpose to encourage in-

dustrial growth by allowing an exemption for items closely connected with the production of goods.

Applying the words of the Idaho statute and what this Court perceives and believes to be the intent of the Idaho legislature and persuaded by the wisdom of the courts of Indiana and Ohio, this Court concludes that the safety equipment in question here was tax exempt. Therefore, plaintiff is entitled to a refund for the taxes it has paid thereon.

## V. PENALTY AND INTEREST

Having determined that the plaintiff has paid all the taxes it was required to pay and, as to the safety equipment, has paid more than it was required to pay and is entitled to a refund thereon, there is obviously no unpaid tax due from plaintiff. Therefore there would be no penalty and interest to be assessed. Having determined that no penalty and interest are thus due, this Court will not engage in the exercise of deciding whether or not any penalty and interest would be appropriate if there had in fact been tax due.

## VI. CONCLUSION

The Court concludes that plaintiff is entitled to judgment decreeing that it has paid all required taxes on the materials involved in the tall stacks, the oxygen and acetylene, the rails, spikes and ties, and is entitled to a refund for the taxes paid upon the safety clothing and equipment. Counsel for the plaintiff shall prepare and submit judgment accordingly.

DATED this 27th day of August, 1984.

/s/Watt E. Prather
Watt E. Prather,
District Judge