813 P.2d 340

**POTLATCH CORPORATION,**
**Plaintiff–Appellant,**

v.

**IDAHO STATE TAX COMMISSION,**
**Defendant–Respondent.**

No. 18409.

Supreme Court of Idaho,
Boise, January 1991 Term.

March 1, 1991.

Rehearing Denied May 10, 1991.

Cumer L. Green, Boise, for plaintiff-appellant.

Jim Jones, Atty. Gen., Theodore V. Spangler (argued), Deputy Atty. Gen., Boise, for defendant-respondent.

JOHNSON, Justice.

This is a use tax case involving the application of the "production exemption" contained in I.C. § 63–3622(d) [now I.C. § 63–3622D] (the production exemption). It is a companion case to *Idaho State Tax Comm'n v. Haener*, Dkt. No. 17729 (Idaho Dec. 11, 1990).

The exemption of several of the items that were originally at issue in this case was resolved in *Haener*. We apply *Haener* in a modified prospective fashion. We hold that the remainder of the items that are at issue here are not exempt from the use tax.

I.

THE BACKGROUND AND PRIOR
PROCEEDINGS.

The Potlatch Corporation is engaged in logging, milling, paper making and related activities throughout Idaho. The Idaho

State Tax Commission assessed use tax on Potlatch's use of certain items of tangible personal property which Potlatch contends are exempt from use tax under the production exemption.

In 1976, the Commission audited the records of Potlatch for the tax years 1972 through 1974, and filed a notice of deficiency determination claiming that Potlatch had failed to pay use tax for those years as required by state law. Following administrative proceedings, the Commission issued its final decision assessing use tax and interest. This amount was paid by Potlatch. Potlatch then filed a petition in district court for review of the Commission's decision.

The district court ruled that the Commission was correct in assessing use tax on the items that Potlatch claimed were exempt. Potlatch appealed.

## II.

ITEMS THAT ARE EXEMPT BECAUSE OF *HAENER*; *HAENER* APPLIED IN A MODIFIED PROSPECTIVE FASHION.

 In *Haener*, we reinterpreted the scope of the production exemption. Potlatch and the Commission agree that the following items, which were determined by the district court to be subject to the use tax, are exempt under the production exemption as reinterpreted in *Haener*:

1. Sharpening equipment.
2. Oxygen and acetylene.
3. Hoists.
4. Rental of construction equipment.

*Haener* determined whether these items qualify for the production exemption. In holding that they do qualify, we overruled portions of *Bunker Hill Co. v. State Tax Comm'n*, 111 Idaho 457, 725 P.2d 162 (1986). *Haener* does not state whether the new interpretation of the production exemption will be applied retroactively, prospectively, or in a modified prospective fashion. We now hold that the new interpretation of the production exemption in *Haener* will be applied in a modified pro-spective fashion and will, therefore, govern this case.

In *Thompson v. Hagan*, 96 Idaho 19, 25, 523 P.2d 1365, 1371 (1974), the Court examined the three options it has in determining how a new rule of law should be applied:

Three different approaches to retroactivity can be identified. The first approach is the traditional rule which is derived from the concept that courts do not pronounce new law, but only discover the true law. Under this approach there are no new decisions, but only clarifications of the true law which makes a decision applicable to both past and future cases. The second approach is the prospective rule. Under this rule a decision is effective only in future actions, and does not affect the rule of law in the case in which the new rule is announced. The third approach is the modified prospective rule which is a combination of the traditional and prospective rules. Under the modified prospective rule, the new decision applies prospectively and to the parties bringing the action resulting in the new decision; or, to the parties bringing the action and all similar pending actions.

In deciding how to apply a change in a host's liability in a negligently caused automobile accident in *Thompson*, the Court focused on three factors: (1) the purpose of the new decision, (2) reliance on the prior rule of law, and (3) the effect on the administration of justice. In *Thompson*, the Court found that the factor of reliance on the prior rule of law was very strong and decided to apply the new rule in a modified prospective fashion, applying the decision to the case before the Court, to all pending actions at the date of the Court's decision, and to all actions arising in the future.

Because of the reliance on the interpretation of the production exemption in *Bunker Hill*, including the collection of sales and use taxes by the state that have already been appropriated and expended, we conclude that it is not appropriate to apply the new interpretation contained in *Haener* retroactively. Those taxpayers, however, who on December 11, 1990 (the day *Haener* was issued by this Court) had pending an

appropriate challenge to the interpretation of the production exemption contained in *Bunker Hill* should have the advantage of the new interpretation. Therefore, we apply *Haener* to the sales or use tax liability of any taxpayer who had challenged the interpretation of the production exemption contained in *Bunker Hill* and with regard to the challenge, as of December 11, 1990:

(a) had paid taxes under protest, had time remaining under the applicable law to petition the Commission for a redetermination of these taxes, and thereafter filed a timely petition for redetermination, or

(b) had a petition for redetermination pending before the Commission, or

(c) had received a decision of the Commission denying, in whole or part, the challenge of the taxpayer, had time remaining under the applicable law to appeal the decision to the board of tax appeals or to bring an action in district court for review of the decision, and thereafter filed a timely appeal or action, or

(c) had an appeal pending before the board of tax appeals, or

(d) had pending in either the district courts or appellate courts of this state (1) an appeal from a decision of the board of tax appeals or (2) an action for review of a redetermination of the Commission.

In addition, *Haener* shall apply to all sales at retail and all storage, use, or other consumption of tangible personal property in this state that occurred after December 11, 1990. In all other cases *Haener* shall be applied prospectively.

### III.

### THE REMAINING ITEMS IN ISSUE ARE NOT EXEMPT, BECAUSE THEY INVOLVED TANGIBLE PERSONAL PROPERTY THAT WAS USED TO CONSTRUCT, ALTER, REPAIR OR IMPROVE REAL ESTATE.

■ Potlatch asserts that remaining items in issue are exempt from use tax under the production exemption. We disagree. These items involved tangible personal property that was used to construct, alter, repair or improve real estate.

Potlatch and the Commission stipulated to the following descriptions of the remaining items that are at issue here:

*Propane Fuel Tank Storage.* Tank used to receive, hold and disperse propane fuel used in the production process, more particularly described as follows:

(a) Approximately 5,000 gallon total capacity propane tanks holding propane fuels used at the Potlatch St. Maries Plant primarily for use by lift trucks directly engaged in the production process. Some of this fuel is also used by lift trucks not directly engaged in the production process.

(b) A propane pump used to dispense propane from the propane tank at the Potlatch Jaype Plant into the lift trucks which are used in the production process.

(c) A propane tank stand used to hold and support the propane tank at the Potlatch Jaype Plant.

(d) A 30,000 gallon propane tank at the Potlatch Post Falls Particle Board Plant. Propane is used to fire and to provide fuel to the main power boiler, which power boiler is an integral part of the production process.

*Logging Road Equipment, Material and Repair Parts.* These items are all used in the construction and repair of logging roads, constructed by Potlatch as part of the logging process, both on land owned by Potlatch Corporation and by the United States Forest Service. These items are more particularly described as follows:

(a) A D–8 caterpillar which is used to build logging roads in Potlatch's Northern Logging Operations.

(b) Road graders used in Potlatch's northern logging operations for construction of logging roads and used to bring logging roads, once used, back to their original condition of smoothness and grade. The graders are also used for snow removal.

(c) A backhoe used in Potlatch's northern logging operations for the construction of logging roads, including, but not

limited to, the installation of culverts necessary to the road drainage system and also used to bring these drainage systems back to their original condition, which, either through erosion or because of other reasons, have deteriorated.

(d) A brush blade which is used in Potlatch's northern logging operations for slash treatment at woods landings and for scarification, which process is a necessary part of the logging operation.

(e) Concrete sometimes used as part of the installation of logging road culverts, which culverts are necessary to the drainage system of said roads.

(f) Gravel used in the construction and installation of logging road culverts, which culverts are necessary to the drainage system of said roads.

(g) Repair parts for D–8 caterpillars which are used as described in 4(a) above.

(h) Repair parts for road graders, which graders are used as described in 4(b) above.

*Trailer Mounted Water Pumps.* Two trailer-mounted water pumps used in Potlatch's Northern Logging Operation to deliver water from natural sources (such as rivers, streams, etc.) to logging road sprinkling equipment, which sprinkling equipment is used to constantly bring the logging road back to its original condition that is necessary to the continued use of the logging road because heavy logging trucks pulverize the original road surface, creating tremendous dust and related problems. The logging roads are necessary to the logging operation, which is part of the total production process.

*Structural Steel Equipment Foundation.* These items consist of structural steel, angle iron, reinforcing steel, wire mesh, grout, concrete, more particularly described as follows:

(a) As part of the construction and installation of exempt production equipment at the St. Maries Plant, *i.e.*, chip n'saw (saw log mill) and hot press foundation support structures. Without the support this equipment would not func-

tion and could not be placed at the required elevation.

(b) Steel used in the construction of the lime scrubbers and chlorine gas scrubber which also serve on the lime scrubber as access platforms and ladders to the lime scrubbers located in the Potlatch/Lewiston Pulp and Paper Mill, which lime scrubbers are used in the production process.

(c) A steel tank which receives reburned lime reclaimed and reused in the production process.

The Idaho Sales Tax Act imposes a use tax on the storage, use, or other consumption in this state of tangible personal property. I.C. § 63–3621(a). The district court ruled that under *Bunker Hill* the propane fuel tank storage and structural steel equipment foundation were not exempt under the production exemption because the tangible personal property was used for incorporation into real estate.

In *Bunker Hill,* the Court considered the argument that the materials used to construct two steel-reinforced concrete smoke stacks were exempt under the production exemption. In rejecting this argument, the Court relied on I.C. § 63–3609(a):

"(a) All persons engaged in constructing, altering, repairing or improving real estate, ... are consumers of the material used by them; all sales to or use by such persons of tangible personal property are taxable whether or not such persons intend resale of the improved property."

111 Idaho at 458, 725 P.2d at 163.

In *Bunker Hill,* the Court ruled that on the date the materials that were incorporated into the stacks were purchased, "the materials were not being used to produce anything under the exemption statute— they were purchased for incorporation into real estate." *Id.* at 459, 725 P.2d at 164. In support of this ruling the Court said:

The rationale for imposing the sales tax on tangible personal property used to construct or improve real estate is well stated in the report of the House Revenue and Taxation Committee on House Bill 222 which implemented the tax. In

referring to I.C. § 63–3609, the report stated:

"Section 9(a) is intended to ensure that there will be a tax imposed on the sale of building materials and other items that will be used to erect buildings or otherwise improve real property. The process of construction is regarded as a service, and sale of materials to the contractor is taxed without regard to resale intentions. This insures that a tax will be collected. Since the sale of the building or other real property will not be taxed, sale of the materials which are used to erect or improve it must be taxed if a tax is to be imposed on consumption of this property."

*Id.* at 459–60, 725 P.2d at 164–65.

Potlatch invites us to overrule this portion of *Bunker Hill* on the ground that the production exemption is applicable to all tangible personal property used in production, whether or not it is used to improve real property. We reject this invitation because it is clear that the legislature intended that tangible personal property used to construct, alter, repair or improve real estate not be entitled to the benefit of the production exemption. The House Revenue and Taxation Committee Report in Support of House Bill 222 (May 4, 1965) (the Committee Report), cited in both *Bunker Hill* and *Haener*, contains unmistakable evidence of this intent.

In commenting on the production exemption, the Committee Report states:

Section 22(d). The function of this section is to establish a conceptual exemption for *materials, machinery and equipment used* or consumed *in the production process.* The design of this section is to *equate the purchase for manufacturing or production purposes with the resale exemption* applied to the purchase of finished goods. *If the goods* which are produced by mining, farming or manufacturing *are to be resold,* then *the material, machinery and equipment entering their make-up should be exempt.*

There are many problems of delineation created by a conceptual, definitory process; other provisions of this section are designed to aid in that process and, in certain areas, to eliminate difficulties of interpretation. Initially, all tangible personal property which will itself become an ingredient part of the product manufactured, processed, mined or farmed is exempt, as is *tangible personal property primarily and directly used* or consumed in or during such process.... This *exemption* also *applies to machinery and equipment* which is essential to the manufacturing process, that would be the case, *for instance,* with the *printing press, lathe or combine* used in the process of producing newspapers, furniture, or wheat respectively.

. . . .

Committee Report, pp. 32–33 (emphasis added).

These comments make it clear to us that in enacting the production exemption, the legislature did not intend to modify the effect of I.C. § 63–3609(a), which provides that all use of tangible personal property by those who construct, alter, repair or improve real estate is taxable. The portion of the Committee Report quoted above focuses on materials, machinery and equipment used in the production process, not on materials, machinery and equipment which are used to construct, alter, repair or improve real estate, which is then used in the production process. This interpretation is also borne out by the examples of taxable and nontaxable items listed in the portion of the Committee Report commenting on the production exemption.

In listing items that would be taxable under what became I.C. § 63–3622(d), the Committee Report began: "Material which becomes a part of a building housing a manufacturing plant." Committee Report, p. 34. Later in the same section, the Committee Report lists as a taxable item: "Material which becomes a structural part of a building, shed or structure affixed to real estate." Committee Report, p. 36. This is clear evidence that the drafters of the production exemption did not intend that it should erode the taxation of tangible per-

sonal property used to construct, alter, repair or improve real estate.

In this case, the district court concluded that tangible personal property which was used by Potlatch in creating the propane fuel tank storage and structural steel equipment support had become affixed or incorporated in the real estate and affirmed the decision of the Commission to tax the use of this tangible personal property. Based on our analysis above, we agree with this conclusion.

In affirming the Commission's decision to tax the use of the tangible personal property which Potlatch used in conjunction with the logging road equipment, material and repair parts and the trailer mounted water pumps, the district court reasoned that these items were not used in the actual manufacturing process. While we agree with the conclusion the district court reached, we believe the analysis that focuses on tangible personal property which is used to construct, alter, repair or improve real estate is the correct one to apply to these items also. In *Bunker Hill*, the Court employed this analysis in holding that the track, spikes, and ties purchased to construct a surface railroad were not exempt under the production exemption. 111 Idaho at 460, 725 P.2d at 165.

It is clear from the stipulated description of the logging road equipment, material and repair parts and the trailer mounted water pumps that these items were used to construct, alter, repair or improve real estate—the logging roads. These items are, therefore, subject to use tax pursuant to I.C. § 63–3609(a). The production exemption was not intended to affect this result.

### IV.

### CONCLUSION.

We affirm the decision of the district court with regard to the imposition of use tax on the personal property used by Potlatch in connection with the following items:

1. Propane fuel tank storage.
2. Structural steel equipment foundation.

3. Logging road equipment, material and repair parts.
4. Trailer mounted water pumps.

We reverse the decision of the district court with regard to the imposition of use tax on the personal property used by Potlatch in connection with the following items:

1. Sharpening equipment.
2. Oxygen and acetylene.
3. Hoists.
4. Rental of construction equipment.

We remand the case to the district court for entry of judgment in accordance with this opinion.

Because of the mixed result, we award no costs on appeal. No attorney fees were requested.

BAKES, C.J., BISTLINE, BOYLE and McDEVITT, JJ., concur.